

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### St. Louis District Office

Robert A. Young Bldg
1222 Spruce St, Rm 8.100
Saint Louis, MO 63103
(314) 539-7800
TTY (314) 539-7803
FAX (314) 539-7894
1-800-669-4000

| | |
|---|---|
| Cynthia Moore,<br>      Complainant,<br><br>               v.<br><br>Eric Holder,<br>Attorney General,<br>Justice, Department of,<br>      Agency. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

EEOC No. 560-2010-00168X
Agency No. OBD-2008-00632

Date:  July 12, 2012

## ORDER ENTERING JUDGMENT

For the reasons set forth in the enclosed Decision dated 12-JUL-12, judgment in the above-captioned matter is hereby entered.  A Notice To The Parties explaining their appeal rights is attached.

This office is also enclosing a copy of the hearing record for the agency and a copy of the transcript for complainant and/or his/her representative.

This office will hold the report of investigation and the complaint file for sixty days, during which time the agency may arrange for their retrieval.  If we do not hear from the agency within sixty days, we will destroy our copy of these materials.

It is so ORDERED.

For the Commission:

Andrea M. Niehoff
Administrative Judge
Telephone:  (314) 539-7800
Facsimile:  (314) 539-7894

EXHIBIT
2

# CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing Order Entering Judgment within five (5) calendar days after the date it was sent *via* First Class Mail. I certify that on July 12, 2012, the foregoing Order Entering Judgment was sent *via* First Class Mail to the following:

Cynthia Moore
12858 Four Winds Farm Drive
Saint Louis, MO 63131

Robert Garfield, Esq.
727 Lantern Lane Court
St. Louis, MO 63132

Dept. of Justice
Civil Rights Division
950 Pennsylvania Ave., NW
Mark Gross, CAO, Ste. 5300
Washington, DC 20530

Paul Bridenhagen, Esq.
Executive Office for the U. S. Trustee
20 Massachusetts Ave., NW
Washington, DC 20530

Andrea M. Niehoff
Administrative Judge

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
ST. LOUIS DISTRICT OFFICE
FINDINGS OF FACT AND CONCLUSIONS OF LAW IN THE DISCRIMINATION
COMPLAINT OF:
CYNTHIA MOORE
AND
ERIC HOLDER, JR., ATTORNEY GENERAL,
DEPARTMENT OF JUSTICE
EEOC CASE NO. 560-2010-00168X
AGENCY CASE NO. OBD-2008-00632
July 12, 2012

COMPLAINANT:

    Cynthia Moore
    12858 Four Winds Farm Drive
    St. Louis, MO 63131

COMPLAINANT'S REPRESENTATIVE:

    Robert Garfield, Esq.
    727 Lantern Lane Court
    St. Louis, MO 63132

AGENCY APPEALS:

    Department of Justice
    Civil Rights Division
    950 Pennsylvania Ave., NW
    Mark Gross, CAO, Ste. 5300
    Washington, DC 20530

AGENCY REPRESENTATIVE:

    Paul Bridenhagen, Esq.
    Executive Office for the U.S. Trustee
    20 Massachusetts Ave., NW
    Washington, DC 20530

NATURE OF COMPLAINT:

    Race

ADMINISTRATIVE JUDGE:

    Andrea Niehoff
    Equal Employment
    Opportunity Commission
    St. Louis District Office
    1222 Spruce Street, Rm. 8.100
    St. Louis, Missouri 63103

# I. INTRODUCTION

Pursuant to Section 1614.109 of the Equal Employment Opportunity Commission (EEOC) regulations a hearing was conducted on May 8 and 9, 2012, at the EEOC St. Louis District Office in St. Louis, Missouri. The hearing involved the following issues: whether Cynthia Moore, hereinafter referred to as Complainant, was discriminated against by the Department of Justice, Executive Office for United States Trustees, hereinafter referred to as the Agency, on the basis of her race (African American) when: 1. on September 16, 2008, she was not selected for a Senior Bankruptcy Analyst position; 2. the selectee had been pre-selected for the position; and 3. Complainant was told that the position would be in the regional office only.

At the hearing, seven witnesses testified including: Complainant (African American); Cindy Beck (Caucasian); Robert Newton (Caucasian); Martha "Marty" Hallowell (Caucasian); John Church (Caucasian); Tonja Nero-Britt (African American); and Nancy Gargula (Caucasian). Complainant Exhibits 1-15, 26 and 27 were admitted, Agency Exhibits 1-9 were admitted, and Joint Exhibit 1 was admitted. The record also contains the investigative file, the complaint processing documents, hearing transcripts and the written closing arguments of the parties.

# II. FINDINGS OF FACT:

A. Administrative Procedural Background:

On September 23, 2008, Complainant went to an EEO counselor alleging discrimination based on her race (African American) when on September 16, 2008, she was not selected for a Senior Bankruptcy Analyst position. This matter was not resolved during the counseling stage

and on December 1, 2008, Complainant timely filed a formal EEO complaint, alleging discrimination regarding the following issues: a. she was not selected for the Senior Bankruptcy Analyst position; b. management engaged in pre-selection by giving the selectee preferential treatment prior to the selection; c. selectee received training not afforded to others prior to her selection; d. another employee suggested that the duties be shared by the field offices and this suggestion was ignored; and e. the managerial official informed her that the position was restricted to the regional office only. The Agency accepted issues a, b, and e for investigation. The Agency dismissed Issues c and d as untimely filed and to date, Complainant has not objected to the dismissal of these issues. Therefore, the dismissal of these issues is sustained and will not be specifically addressed in this decision. Subsequently, Complainant timely requested a hearing before an Administrative Judge and on April 1, 2010, the report of investigation was received by the EEOC.


B. Factual Background:

Since 1988, Complainant has worked for the Agency as a Bankruptcy Analyst in St. Louis. At all relevant times, Complainant was supervised by Assistant U.S. Trustee, Paul Randolph. U. S. Trustee Nancy Gargula (Caucasian) presides over the regional office of the Agency from Indiana, covering two regional offices in Indiana and Kansas City, Missouri and the field office in St. Louis, Missouri. Complainant testified that her current duties consist primarily of analyzing financial reports of companies and individuals in bankruptcy, investigating for fraud, conducting field examinations, and evaluating control procedures. Complainant stated that she has worked on most of the large Chapter 11 reorganizations of

business debtors in her region. Complainant testified that she also conducts Chapter 12 audits, which involve the reorganization of farms, and she provides guidance to attorneys and paralegals in preparation for litigation.  She testified that in recent years, she has primarily focused on Chapter 7 and 11 cases.

Complainant also testified regarding her prior work experience and her education. Complainant is a Certified Public Accountant (CPA), and she has obtained a Bachelor of Science degree.  She served as an accountant for a public accounting company for 1 or 2 years, she also worked in Arkansas as a security officer, and as an auditor for a bank.

On or about August 18, 2008, the Agency announced a GS-15 Senior Bankruptcy Analyst vacancy with the duty location of Kansas City, Missouri.  (Investigative file, Exhibit E3).  As stated in the position description, the duties of a Senior Bankruptcy Analyst are as follows:  advise the U. S. Trustee on the most complex cases filed in the Region, and all trust audits;  perform analytical work on Chapter 11 cases involving Regional exposure;  manage the supervision and evaluation of Chapter 7 Panel Trustees, Chapter 12/13 Standing Trustees and Chapter 11 Trustees;  assist the U. S. Trustee in the development of regional policies; supervise and provide guidance and direction to lower graded analysts;  conduct fraud investigations; and assist the U. S. Trustee in the organization and supervision of creditor committees. (Investigative file, Exhibit E-4, pp. 4-5).

John Church (Caucasian), who retired in May 2008, served as the GS-15 Senior Bankruptcy Analyst in Kansas City, Missouri as the incumbent in the position at issue. Mr. Church testified that in his position, he served as the Standing Trustee Coordinator.  He explained that there were six trustees in the region and he was tasked with reviewing the budget

and financial reports of these trustees. He added that he also served as a field examination and audit coordinator in Chapter 7 cases, and he had analyst duties. He testified that the Standing Trustee Coordinator duties were complex. He explained that the trustees, with an average of 30 employees, had 300-400 million dollar annual budgets. He testified that the oversight of the trustees required very detailed work.

It is undisputed that the vacancy announcement indicated that the position was in Kansas City, Missouri. (Investigative file, Exhibit E-3, p. 1). The closing date of the application was August 25, 2008. Id. Complainant testified that on August 19, 2008, Robert Newton (Caucasian), Administrative Assistant in the Regional office, sent her an email advising her of the vacancy. Complainant testified that she had never known of such a short time period to apply for a position and she had to quickly complete her application because she had an upcoming scheduled vacation. She testified that with more time, she could have provided more detail in her application. She added that her vacation was scheduled in the staff system and any employee could have seen that she had an upcoming vacation. She testified that she called Mr. Newton and asked him why the application was limited to one week, and he said that it was Ms. Gargula's decision.[1]

During the relevant time period, Cindy Beck (Caucasian) worked as the Deputy Assistant Director of Management Services, and the Acting Human Resources Officer in Washington, D.C. She testified that she assisted Ms. Gargula in creating the announcement for the position at issue. She and Ms. Gargula explained that the position was only posted for 7 days because Ms. Gargula wanted the position filled quickly because a hiring freeze had been removed for an

---

1 Complainant also seemed to object to the fact that eligibility was limited to Region 13. However, as Complainant is an employee in Region 13, this fact is irrelevant in this case.

unknown time period.

It is undisputed that Complainant applied for the position; she was deemed qualified for the position, along with Amy Carpenter (Caucasian), a GS-14 Bankruptcy Analyst in the Kansas City, Missouri regional office. Both candidates were referred for interviews, which were conducted by Ms. Gargula and Daniel Casamatta, Assistant U. S. Trustee in the regional office in Kansas City, Missouri.

Complainant testified that Ms. Gargula called her and told her she was going to be interviewed for the position. She added that Ms. Gargula also told her that she had received an award. Complainant testified that she told Ms. Gargula that she (Complainant) and Mr. Randolph had discussed her request for promotion to a GS-15 position in St. Louis that she had made a few weeks before, and she told her that on three prior occasions, her promotion requests were denied because she was not in a regional office. Complainant testified that Ms. Gargula informed her that the position was in Kansas City; that the position had always been in Kansas City because the position had to be located in a regional office. She told Ms. Gargula that Mr. Randolph told her that he did not know if Senior Bankruptcy Analyst positions were limited to Regional offices; that he suggested that she contact Wanda Lewis, a Human Resource Specialist in the Executive Office of the Agency in Washington, DC, to confirm this information. Complainant testified that Ms. Lewis told her that in the regions that she works with, these positions are in the regional offices, but she did not work with all of the regional offices. Complainant testified that Ms. Gargula said she would not be promoted in St. Louis, reiterating that the Senior Bankruptcy Analyst positions were located in the Regional office. Complainant testified that she asked Ms. Gargula if there were any of the positions in offices other than

regional offices, but Ms. Gargula repeated that it was her decision to have the position in the Regional office. Complainant testified that she asked her again if there were any GS-15 positions outside regional offices.

Complainant testified that she had reason to believe that there were GS-15 positions outside of Regional offices because she had seen staffing lists. Records reveal that in 2010, all but two or three GS-15 analyst positions were in regional Offices, but in 2012, out of twenty-one regions, there were seven GS-15 analysts in district offices. (Complainant Exhibits 3 and 26)

Ms. Gargula also testified concerning this conversation with Complainant. She testified that Complainant told her that the duties could be performed in St. Louis and she and her supervisor were in the process of moving the job to St. Louis. Ms. Gargula testified that she said no, the position was in Kansas City and Complainant repeated that they were going to move it. Ms. Gargula testified that she then told Complainant that "you are talking to the person who served as the supervisor to the senior bankruptcy analyst position and that the position had always been in the Kansas City office and would remain in the Kansas City office." (Hearing transcript p. 318) However, she admitted that Complainant never said that she would not move to Kansas City. Ms. Gargula testified that this conversation took place the day before the interview and Complainant "telegraphed" during the interview that she thought she could do the job in St. Louis. Id. at p. 319.

Ms. Gargula also testified that she spoke to Mr. Randolph about this conversation. She testified that she asked him if he was the supervisor who is trying to relocate a Senior Bankruptcy Analyst position to St. Louis. She testified that he said he never told Complainant that he would assist her in moving the position to St. Louis. He said that Complainant had

expressed her interest in a promotion and he said he would talk to her about it later.

Complainant testified that she never told Ms. Gargula that she was not willing to relocate to Kansas City, Missouri. It is undisputed that Ms. Gargula asked Mr. Newton to contact Complainant and verify that Complainant understood that the position was in Kansas City. Complainant and Mr. Newton confirmed that this conversation took place and that Complainant verified that she was willing to relocate to Kansas City. Mr. Newton testified that he provided this information to Ms. Gargula. Ms. Gargula admitted that Mr. Newton told her that Complainant said she was aware that the position was in Kansas City.

Ms. Beck testified that it was Agency policy to place GS-15 Senior Bankruptcy Analysts in the Regional office. She testified that U. S. Trustees can make a case to locate them in other offices and a U.S. trustee had to approve the two exceptions that she is aware of. She added that the documents referred to by Complainant, the telephone directory, indicated that there are more Senior Analysts, but these are not accurate; some of these employees are GS-14 "carryovers" from a former 1985 pay-for-performance system, reclassified as GM-14's. She added that the system ended in 1993, but those employees kept that title, although they are GS-14's.

It is undisputed that Complainant's interview was conducted by video with Ms. Gargula and Mr. Casamatta. Complainant testified that Ms. Gargula reiterated that the position was in Kansas City and she replied that she noticed that fact. Complainant testified that she was then asked a series of questions, some of which pertained to her experience with Chapter 13 cases. Complainant testified that the written questions contained in the Investigative file, Exhibit E-8, were not asked in that same manner. Specifically the written questions states "familiar with" the duties of the position rather than experience with the duties of the position. Complainant

testified that her answers to the questions would have been different had they asked her if she was "familiar with" rather than actual experience, because she was familiar with Chapter 13 issues, but she did not have experience working with Standing Trustee Coordinator duties because she had not been assigned this work. She testified that when Ms. Gargula asked her about such experience, she was "put off" by the questions because she knew the only analysts assigned to these duties were GS-15 Senior Bankruptcy Analysts. Complainant testified that this was a "set up" and she responded to Nancy, "The only person that does these duties is John Church." (Hearing transcript p. 41) However, Complainant testified that she also told them that for many years, she had been performing at the level of a GS-15 Senior Analyst, as written in the position description.

Since April 2008, Daniel Casamatta (Caucasian) has worked at the Agency as the Assistant U.S. Trustee for the Kansas City office. Mr. Casamatta testified that he reviewed the applications of Complainant and Ms. Carpenter prior to their interviews for the position. He was also familiar with Ms. Carpenter's work in the office.

Mr. Casamatta testified that Complainant's responses to her interview questions raised some concerns for him. First, he testified that he had some concern that Complainant intended to move the position to St. Louis. He explained that he was aware that that Complainant had told Ms. Gargula that Complainant wanted to move the position to St. Louis so he asked Complainant how it would work for her to work in his office if the position was moved to St. Louis and Complainant answered that she would do it if it was a good fit. He testified that she added that she was going to do some soul searching, and would not take the job if it was not a good fit. He testified that he was concerned because he needed the position in the Kansas City office. The

9

position included field work that would have to be done in Kansas City. He explained that if the position moved to St. Louis, the Kansas City office would then have to hire an analyst, but due to the hiring freeze, there was no guarantee that they could do that.

Mr. Casamatta also testified that he was concerned with Complainant's response to the question why do you want the position, and Complainant answered that she wanted a promotion. He also testified that in response to a question to describe her greatest weakness, she answered that she has concerns for rules and bureaucracy that do not make sense. Mr. Casamatta testified that the standing coordinator position is governed by a written handbook for every aspect of the job. He explained that if the Complainant decided she didn't like the rules, it would weaken the oversight nature of the position. He testified that he was surprised that someone applying for this position would say this because there were rules governing the position. He testified that if the rule is there, it is your responsibility to follow it; that is the job.

Mr. Casamatta also testified that when Complainant was also asked if she could do the job and she responded; "I don't think its rocket science." He testified that her tone of voice was very cavalier. He testified that in his opinion, she was underestimating the complexity of the job. He testified that he has a degree in finance and he has worked with standing trustee coordinators before and he is aware of its complexity. He explained that the coordinator oversees the expenditure of millions of dollars, involving many employees. The position can involve difficult personnel issues and complex budget and reporting issues. He surmised that Complainant was not fully aware of all the duties. He added that he was aware that Mr. Church had contacted Complainant in the past and Complainant had said if there was no more pay, she would not help him.

Ms. Gargula also testified concerning her impressions of Complainant from the interview. First, she noted that in response to the question "why are you interested in this position ?," Complainant responded that she was interested in a promotion, and that she deserved to be promoted after 20 years at the Agency. Ms. Gargula testified that this response did not indicate that she was interested in the position. Ms. Gargula added that Complainant did not express that she had any interest in the job. Ms. Gargula stated that she has never interviewed anyone who knew so little about the job; had not taken initiative to find out what the job duties entailed; and who just acted like she was due the job. She concluded that she has never experienced anyone in an interview who behaved like this.

Second, she noted that when Complainant was questioned about her various job experiences as an analyst, which were also some of the duties of senior analyst position, she was surprised that Complainant did not have this experience. She explained that all Agency analysts should have had this experience.

Third, Ms. Gargula was concerned with Complainant's response that the work of a Senior Bankruptcy Analyst was not "rocket science." Ms. Gargula stated that this comment was made despite the fact that she said she had no experience in the job. Ms. Gargula concluded that Complainant failed to recognize the complexity of the job.

Lastly, Ms. Gargula testified that Complainant could not name any work completed on any national projects, as opposed to Ms. Carpenter, who had such experience. Ms. Gargula added that Ms. Hallowell was very impressed with Ms. Carpenter and had shared Ms. Carpenter's work as a best practice to other regions.

Ms. Gargula admitted that Complainant had more far more field analyst experience than

Ms. Carpenter. However, Ms. Gargula surmised that as a controller for a large company, Ms. Carpenter may have had bankruptcy experience outside the Agency. She added that Ms. Carpenter had been a public accountant and an auditor, who oversaw an Office of Inspector General audit in 2006. She also testified that Ms. Carpenter's analyst work was good, even without the same years of experience. She testified that Ms. Carpenter's communication skills were outstanding, which was an integral part of the job. She reiterated that Ms. Carpenter's experience in the private sector was relevant and parallel to some of the duties for the job. Ms. Carpenter had management experience as a controller, she had been the primary contact for audits, she oversaw payroll for company with over 800 employees, and she led the program for positive pay in a private company. Ms. Carpenter had experience with national projects as she had been appointed by the Agency's executive committee tasked with drafting and reviewing manuals. Lastly, she had also shown the ability to perform the Standing Bankruptcy Coordinator duties for a 3-month period and she indicated that she was interested in the particular position, not just a promotion.

Mr. Casamatta and Ms. Gargula testified that after interviews concluded, they debriefed and discussed their impressions of the applicants. Mr. Casamatta testified that he independently concluded that Ms. Carpenter was better qualified and he expressed this opinion to Ms. Gargula.

Mr. Casamatta testified regarding his recommendation of Ms. Carpenter for the position at issue. He testified that he was aware of Complainant's 20 year of experience at the Agency in contrast with Ms. Carpenter's less than 2 years of work at the Agency. He explained that if this was an analyst position, Complainant would have been more qualified, but the Senior Bankruptcy Analyst position was different because it included the Standing Bankruptcy

Coordinator duties, which were supervisory and managerial in nature. He explained that Ms. Carpenter was better qualified for this position because she had prior manager and supervisory experience and Complainant did not have such experience. He also explained that Ms. Carpenter was fully trained as an analyst at that time. While Ms. Carpenter mentioned in her interview that she lacked tax experience in Chapter 11 cases, he was not concerned by this fact because these issues are infrequent and she could learn these duties. He added that the tone of each interview was totally different; Complainant was "flip and cavalier" and Carpenter was not.

Ms. Gargula also conceded that Complainant, with 20 years of experience as an analyst, was more qualified with respect to analyst duties, but she too, had concerns raised during the interview. In sum, she concluded that Complainant maintained that she could do the job from St. Louis; she did not express interest in the particular job, she was just interested in a promotion; she did not understand the duties; she underestimated the complexity of the job, and her dislike of rules was a concern because a handbook was the "Bible" for the job.

Complainant initially testified that she "takes exception …[to Ms. Gargula's statement] that I felt like I was somehow entitled to the promotion or deserved the position just because I just wanted to be promoted." (Hearing transcript p. 44) However, Complainant then admitted that "I did say there aren't very many opportunities for promotion and, you know, this one had presented itself and I applied for the job." Id. Complainant also admitted that she did state that her greatest weakness was that she can be impatient with rules that in her opinion, had no good reason for them. Id. Complainant also admitted that when asked the question; "Although you don't have experience in Chapter 13 cases, can you do the job?" She responded; "It's not rocket science." Id. at p. 46. Complainant also admitted that when she was asked if she had worked on

13

any national assignments, she told them she could not recall having done so.

Mr. Church testified that while working at the Agency, he occasionally asked for assistance from other analysts, through the U.S. trustee, who would ask for volunteers in the region. He testified that an analyst from the St. Louis office had volunteered, but in recent years, Complainant had never done so. He added that Complainant assisted him in the 1990's, but at one time, he requested help in the Kansas City office and she said she was too busy and wouldn't assist him without more pay.

Complainant testified that she believes she was more qualified for the position because she has over 20 years of analyst experience at the Agency, versus the Selectee, who had less than 2 years of analyst experience at the Agency. Complainant testified that it is true that she lacks Standing Trustee Coordinator experience because she was never assigned these duties. Complainant also testified that it is true that the Selectee had this experience because the Selectee was specifically trained in these duties. Complainant testified that no other analyst was given these duties and she asserts that the Selectee was pre-selected for the position.

In March 2007, Mr. Church notified Ms. Gargula that he intended to retire in May 2008. Soon thereafter, in an email to the then Assistant Director for Administration, Jeffrey Miller, Ms. Gargula asked for early recruitment to fill Mr. Church's position. (Complainant Exhibit C-9) She explained that Ms. Carpenter was "very sharp but has only been with us since last October." Id. She continued that Rodney Clark (white), an analyst in Little Rock, was the only analyst in the Region who could assume Mr. Church's duties, but he was the same age as Mr. Church and was "close to total burn out at this point" as the only analyst in that office. Complainant pointed out that she was not mentioned by Ms. Gargula in this email.

Mr. Newton testified that Mr. Church told him that he was "preparing and grooming" Ms. Carpenter in advance of his retirement. (Hearing transcript p. 118). He added that Ms. Carpenter also told him that she was being prepared to assume Mr. Church's duties upon his retirement. Id.

Ms. Gargula testified that in the Spring of 2007, Mr. Church asked for help with his duties, but he was not specific about what type of work. Ms. Gargula added that he did ask if Ms. Carpenter could help with duties and she left it to his discretion as to what type of work she would do. She testified that Complainant was not an option because she was not in the Kansas City office. She explained that the Standing Trustee Coordinator was a direct report to her and she was in Kansas City. She added that in the past, Mr. Clark had filled in for Church by traveling to Kansas City and doing the job. She testified that at this time, the Agency did not have room for any employee outside of Kansas City, because the Kansas City office had 3 analysts and no more office space.

Mr. Church explained his decision to train Ms. Carpenter and his recommendation that Ms. Carpenter assume his duties upon his retirement. He testified that his only choices in his office were Analyst Tonja Nero-Britt (African American) or Ms. Carpenter. He explained that there was great disparity in their abilities. He testified that while Ms. Nero-Britt[2] had more experience in the office and in bankruptcy cases, she was weak from an accounting standpoint, and she didn't understand the companies that she was reviewing. He added that the Agency at that time could not afford to pay an employee to travel to his office in Kansas City, so it had to be an analyst in his office.

---

2 Ms. Nero-Britt testified that she had no interest in the position at issue because she only had two years of experience as an analyst. She did not apply for the position at issue.

15

Mr. Church testified that Ms. Carpenter had a lot of private sector accounting experience, explaining that she had as B.S. and a Master's degree in accounting, and she had been the controller for a major health insurance company. He added that Ms. Carpenter understood modern technology better than he did, she frequently added improvements to work methods, she had a good work ethic, and a high energy level.

He also testified that one year, while he took one week of vacation, he asked Ms. Carpenter to perform his duties in his absence and she got involved in the Standing Trustee Coordinator process. He added that the Standing Trustee Coordinator position is not necessarily the same as the Senior Analyst position. He was grooming Ms. Carpenter in the standing coordinator duties because it was his only chance to train someone in these duties prior to his retirement. With regard to "grooming" Ms. Carpenter in his duties, he explained that he was not saying that Ms. Carpenter would be his permanent replacement; he was mentoring her for the interim period between his retirement and the hiring of his replacement. He added that there was a hiring freeze in place when he retired and he did not know when the Agency would be able to hire a replacement. He explained that he needed to tell the trustees who was acting as Standing Trustee Coordinator after he retired.

Martha "Marty" Hallowell (Caucasian) works at the Agency as the Deputy Assistant Director for Standing Trustee oversight in the Executive office for the U.S. trustee. Ms. Hallowell testified that she had worked with Mr. Church on several national projects. She testified that he was a "top tier employee" so she frequently requested his assistance. She testified that she also met and worked with Selectee Carpenter. She explained that when Mr. Church informed the Agency that he was retiring, because he was the only employee working

16

with standing trustees, it was important to Mr. Church that he left the Agency with someone who understood what the duties and obligations involving the standing trustees. She recalled that as early as August 2007, Mr. Church included Selectee Carpenter on all conference calls with her. She added that in October 2007, with approval from the U.S. trustee, she requested that Ms. Carpenter create an amended national budget for the standing trustees. Ms. Hallowell explained that Selectee Carpenter had a private sector accounting background and she highly regarded this experience. She added that Mr. Church was an outstanding employee, he spoke highly of her, and he valued his opinion. Ms. Hallowell testified that Selectee's work on the budget was very good and it was completed in a timely manner. She added that in March 2008, Ms. Carpenter volunteered for another national project, namely, standardizing the scope of work for compensation consultants. She testified that again, her work was timely completed, well-done, and very helpful. Ms. Hallowell testified that in September 2008, she asked Ms. Gargula if Selectee Carpenter could troubleshoot the final annual report, which she also completed. Ms. Hallowell testified that Selectee Carpenter was an impressive employee, she timely completed assignments, showed initiative, was very good at spreadsheets, understood accounting practices, and was she very detail oriented.

Ms. Gargula admitted that in May 2008, Ms. Carpenter was assigned the Standing Coordinator duties. Ms. Gargula explained that she was not detailed into the position; she simply she agreed to assume the duties. Ms. Gargula testified that there was a hiring freeze at that time so she couldn't hire anyone to replace Mr. Church.

Complainant admitted that she does not talk or have contact with Ms. Gargula very often. Complainant also admitted that she had not volunteered for any regional activities, although she

realizes that she could have done so.

Ms. Gargula testified that many employees have asked her for advice regarding promotions and she tells them to volunteer for special projects. She testified that she was aware that Mr. Church has asked Complainant for assistance and she declined to do so. She added that Complainant has never asked her for advice regarding improving her promotion potential. She added that it was well known at the Agency of Mr. Church's intention to retire and Complainant never requested an opportunity to train or perform the Senior Analyst or Standing Coordinator duties.

## III. CONCLUSIONS OF LAW

The United States Supreme Court has provided the legal analysis in a federal employment discrimination case in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). If a complainant does not have direct evidence of discrimination, *McDonnell Douglas* requires that a discrimination case undergo a three-step analysis. The evidence of record must initially establish, by a preponderance of the evidence, a prima facie case of discrimination. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas*, 411 U.S. 792 (1973). If a prima facie case of discrimination is established, the burden shifts to the respondent agency to articulate a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 253-254. If the agency does so, the complainant must then show that the agency's articulated reason is merely a pretext for discrimination. Id. at 256. The burden that shifts to the agency is one of production only; the ultimate burden of persuasion remains with the complainant throughout the analysis. *Burdine*, 450 U.S. at 256. See also, *Hicks v. St. Mary's Honor Center*,

113 S. Ct. 2742 (1993).

In order for a Complainant to establish a prima facie case of discrimination based upon her race in a non-selection case under the *McDonnell Douglas* and *Burdine* framework, Complainant must show that:

1) she is a member of a protected group;

2) she applied for and was qualified for a position for which the employing agency was seeking applicants;

3) despite her qualifications, she was not selected, and;

4) she was rejected under circumstances which give rise to an inference of unlawful discrimination. For example, the employer continued to seek or actually promoted a similarly qualified individual outside Complainant's protected group. *McDonnell Douglas*, at 802, n.13; *Burdine*, at 256, n.6.

Complainant has established that she is a member of a protected group by virtue of her race. It is undisputed that she applied for and was qualified for the position; and that she was not selected despite her qualifications. The analysis must now turn to the Agency's articulated reasons for her non-selection.

The selecting officials concluded that Ms. Carpenter had more relevant work experience for this position; Complainant showed little interest in the actual position; and she conveyed a "flip" attitude during the interview. In contrast, Ms. Carpenter expressed knowledge and interest in the position and had more relevant work experience. Lastly, it is clear that while Complainant may have indicated that she "was aware" that the position was in Kansas City, the selecting officials reasonably believed that Complainant intended to move the position to St. Louis, which

was unacceptable to them. I conclude that the Agency articulated legitimate nondiscriminatory reasons for the selection in this case.

The analysis must now turn to whether Complainant established that these reasons were a pretext for discrimination. Traditionally, in non-selection cases, pretext may be demonstrated upon a finding that a complainant's qualifications are "plainly superior," as compared to those of the selected applicant. See, *Bauer v. Bailar,* 647 F.2d 1037, 1048 (10th Cir. 1981). Moreover, in <u>Garcia v. Department of Homeland Security,</u> the Commission found that pretext was demonstrated by a showing that a complainant's qualifications were "demonstrably superior" to those of the selected applicant. EEOC Appeal No. 01A32050 (January 7, 2005). More recently, the Supreme Court addressed the question of comparative qualifications as evidence of pretext in a non-selection case, and held that the differences in qualifications must be "significant." See, *Ash v. Tyson Foods, Inc.,* 546 U.S. 454 (2006).

With regard to qualifications, Complainant solely argues that she was more qualified for the position based on her years of experience at the Agency. The Commission has held that more years of experience do not necessarily make an applicant more qualified for a particular position. *McGettigan v. Department of the Treasury,* EEOC Appeal No. 01924372 (1993); nor do they automatically make one candidate more qualified than another. *Ford v. Department of Health and Human Services,* EEOC Appeal No. 01913521 (1991)

In this case, the criteria used to rank the candidates gave little, if any, credit for years of analyst experience. Instead, the selecting official focused on the duties of the position. A review of the position description reveals that the GS-15 Senior Bankruptcy Analyst works closely with the U. S. Trustee, on regional cases and policies, as stated by Ms. Gargula. It is also reveals that

it is a supervisory position, with supervisory duties over analysts and trustees. While Complainant had many years of experience as an analyst, she failed to present any evidence of any experience working with a U. S. Trustee, on regional or national projects, nor did she possess any supervisory experience. The Agency has established that Ms. Carpenter had more relevant, and recent, experience for this particular position. Therefore, I cannot conclude that Complainant's years of experience rendered her more qualified for the position, nor that the Agency's failure to assign greater weight to years of experience was unlawful. Moreover,

In the alternative, Complainant argues that the selectee was essentially pre-selected by being provided with specialized training prior to the interview process. It is undisputed that Ms. Carpenter was trained in the Standing Trustee Coordinator duties. However, rather than unlawful race discrimination, it appears that the Agency engaged in discrimination based on her location, that is, she was already in the Kansas City office where Mr. Church could provide the training. Complainant has presented no evidence that the Agency had the space for another analyst in the Kansas City office, as stated by Ms. Gargula, or the financial ability to pay for the travel to Kansas City, as stated by Mr. Church. Indeed, what Complainant established was that she was not even considered because she was not in the regional office, nor had she ever indicated, or accepted, any recent interest in the Standing Trustee Coordinator duties.

While I have concluded that the specialized training was provided to the Selectee, I cannot conclude that this was discriminatory with respect to Complainant. It appears that if any discrimination took place, it was based on the work location of Complainant, not her race. That is, an employee already working in the Regional office were treated more favorably than Complainant, who was not. The geographic location of an employee is not a protected group.

21

Lastly, Complainant alleges that the Agency discriminated against her when she was told that the position had to remain in the regional office. [3] It is not the role of the Administrative Judge to substitute her judgment for legitimate, managerial discretion. *Bennet v. United States Postal Service,* EEOC Appeal No. 01893757 (April 20, 1990); See Burdine, 450 U.S. at 259. While Complainant presented evidence that some Senior Bankruptcy Analysts worked outside the region, the evidence revealed that it was the exception to the rule that these Analysts work in regional office. Ms. Gargula certainly had the authority and the discretion to leave to leave the position in Kansas City. Moreover, she provided nondiscriminatory reasons for doing so. Namely, that she needed to work closely with this Analyst.

In sum, I conclude that Complainant has failed to establish that she was discriminated against based on race with regard to the issues in this complaint.


## IV. NOTICE

This decision is being issued by this Administrative Judge pursuant to 29 C.F.R. §1614.109(b), 109(g) or 109(i). With the exception detailed below, the complainant may not appeal to the Commission directly from this decision. EEOC regulations require the Agency to take final action on the complaint by issuing a final Order notifying the complainant whether or not the Agency will fully implement this decision within forty (40) calendar days of receipt of the hearing file and this decision. The complainant may appeal to the Commission within thirty (30) calendar days of receipt of the Agency's final Order. The complainant may file an appeal

---

3 Complainant also argues that Ms. Carpenter did not meet eligibility requirements. Ms. Beck testified that the time-in-grade requirement did not apply to this position. Complainant presented no evidence to rebut this assertion. It is undisputed that Ms. Beck was not familiar with Complainant or Ms. Carpenter. Therefore, no racial animus can be inferred. Moreover, no evidence was presented that Ms. Gargula or Mr. Casamatta made the determination regarding eligibility.

whether the Agency decides to fully implement this decision or not.

The Agency's final Order shall also contain notice of the complainant's right to appeal to the Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for such appeal or lawsuit. If the final Order does not fully implement this decision, the Agency must also simultaneously file an appeal to the Commission in accordance with 29 C.F.R. §1614.403, and append a copy of the appeal to the final Order. A copy of EEOC Form 573 must be attached. A copy of the final Order shall also be provided by the Agency to the Administrative Judge.

If the Agency has <u>not</u> issued its final Order within forty (40) calendar days of its receipt of the hearing file and this decision, the complainant may file an appeal to the Commission directly from this decision. In this event, a copy of the Administrative Judge's decision should be attached to the appeal. The complainant should furnish a copy of the appeal to the Agency at the same time it is filed with the Commission, and should certify to the Commission the date and method by which such service was made on the Agency.

All appeals to the Commission must be filed by mail, personal delivery or facsimile to the following address:

> Director
> Office of Federal Operations
> Equal Employment Opportunity Commission

Facsimile transmissions over 10 pages will not be accepted.

FOR THE COMMISSION:

Andrea Niehoff
Administrative Judge