Page 1

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
St. Louis District Office

IN RE: CYNTHIA MOORE vs. DEPARTMENT OF JUSTICE

EEOC CASE NO. 560-2010-00168X
AGENCY NO. OBD-2008-00632

TRANSCRIPT OF PROCEEDINGS
MAY 8 & 9, 2012

(Hearing start time: 8:10 a.m.)

Page 2

INDEX OF WITNESSES

CYNTHIA MOORE
- Direct Examination by Mr. Garfield — Page 9
- Cross Examination by Mr. Bridenhagen — Page 72
- Redirect Examination by Mr. Garfield — Page 77
- Rebuttal Direct Examination by Mr. Garfield — Page 390

CINDY BECK
- Direct Examination by Mr. Garfield — Page 78
- Cross Examination by Mr. Bridenhagen — Page 98
- Redirect Examination by Mr. Garfield — Page 106
- Rebuttal Examination by Mr. Bridenhagen — Page 142
- Rebuttal Examination by Mr. Garfield — Page 145

ROBERT NEWTON
- Direct Examination by Mr. Mr. Garfield — Page 110
- Cross Examination by Mr. Bridenhagen — Page 137
- Redirect Examination by Mr. Garfield — Page 141

MARTHA HALLOWELL
- Direct Examination by Mr. Bridenhagen — Page 146
- Cross Examination by Mr. Garfield — Page 159

JOHN CHURCH
- Direct Examination by Mr. Bridenhagen — Page 166
- Cross Examination by Mr. Garfield — Page 196
- Redirect Examination by Mr. Bridenhagen — Page 219
- Recross Examination by Mr. Garfield — Page 221

Page 3

TONJA NERO-BRITT
- Direct Examination by Mr. Garfield — Page 223
- Cross Examination by Mr. Bridenhagen — Page 237

DANIEL CASAMATTA
- Direct Examination by Mr. Garfield — Page 240
- Cross Examination by Mr. Bridenhagen — Page 272
- Redirect Examination by Mr. Garfield — Page 282
- Recross Examination by Mr. Bridenhagen — Page 290
- Further Redirect Examination by Mr. Garfield — Page 292

NANCY GARGULA
- Direct Examination by Mr. Garfield — Page 293
- Cross Examination by Mr. Bridenhagen — Page 357
- Redirect Examination by Mr. Garfield — Page 384

(Day one is page 7 through page 237. Day two is page 238 through page 393.)

Page 4

EXHIBITS

| | |
|---|---|
| Complainant's Exhibit C-3 | Page 33 |
| Complainant's Exhibit C-6 | Page 81 |
| Complainant's Exhibit C-8 | Page 39 |
| Complainant's Exhibit C-9 | Page 57 |
| Complainant's Exhibit C-16 | Page 69 |
| Complainant's Exhibit C-20 | Page 63 |
| Complainant's Exhibit C-21 | Page 65 |
| Complainant's Exhibit C-22 | Page 195 |
| Complainant's Exhibit C-25 | Page 64 |
| Complainant's Exhibit C-26 | Page 33 |
| Complainant's Exhibit C-27 | Page 93 |
| Agency Exhibit 4 | Page 155 |
| Agency Exhibit 6 | Page 100 |
| Agency Exhibit 7 | Page 156 |
| Agency Exhibit 8 | Page 121 |
| Agency Exhibit 9 | Page 227 |

(All exhibits were retained by Judge Niehoff. The index below reflects Agency or Complainant exhibits that were identified during the proceeding).

EXHIBIT 3

### Page 357

1  A  She received an overall rating of excellent.
2  MR. GARFIELD: I'm done with my direct.
3  JUDGE NIEHOFF: Let's take a two minute restroom
4  break.
5  (Whereupon there was a brief recess).
6  JUDGE NIEHOFF: We're back on the record. And I'll
7  remind you that you're still under oath.
8  THE WITNESS: Okay.
9  CROSS EXAMINATION
10  BY MR. BRIDENHAGEN:
11  Q  Miss Gargula, I'd like you to pick up what I think
12  is Exhibit C-9 in front of you.
13  A  Yes.
14  Q  You are familiar with this document?
15  A  Yes, I am.
16  Q  Let me direct you to your email to Jeff Miller
17  dated Sunday, April 15th?
18  A  Okay.
19  Q  2007.
20  A  All right.
21  Q  And specifically your statement it's -- what is
22  it -- Amy Carpenter is very sharp, but has only been with us
23  since last October?
24  A  Yes.
25  Q  By that sentence did you mean to say that Amy was

### Page 358

1  at that time capable of doing of, you know, doing John
2  Church's job?
3  MR. GARFIELD: Objection; he's leading.
4  MR. BRIDENHAGEN: All right.
5  Q  (By Mr. Bridenhagen) What did you mean --
6  JUDGE NIEHOFF: Are you going to rephrase the
7  question?
8  MR. BRIDENHAGEN: Yes, I'm going to.
9  Q  (By Mr. Bridenhagen) What did you mean to say
10  about Miss Carpenter's abilities to do the standing trustee
11  coordinator work in that statement?
12  A  I'm not sure I understand the question. This was
13  the forward of Mr. Church's notification to me that he had
14  finally selected his retirement date.
15  Q  Yes.
16  A  When I first arrived, it was wishy-washy. What I
17  was telegraphing to Mr. Miller was the need to recruit while
18  Mr. Church was still doing his job so that I would get
19  permission to recruit so that Mr. Church would have the
20  opportunity to hire and train -- or not hire, train his
21  replacement so that there would be some overlap. Typically
22  we don't get --
23  Q  Let me rephrase the question.
24  A  Okay.
25  Q  So what extent did you --

### Page 359

1  JUDGE NIEHOFF: What did you mean by Amy Carpenter
2  is very sharp, but has only been here since last October.
3  There is no other analyst. What did you mean by all that
4  about Amy Carpenter?
5  A  Simply that Amy had not been with us long enough to
6  be able at that point in time to necessarily do the duties.
7  She was very sharp obviously, but I felt there was a need for
8  early recruitment.
9  Q  (By Mr. Bridenhagen) Of some -- so it's not -- I
10  got what you said. Never mind.
11  JUDGE NIEHOFF: What do you mean by recruitment?
12  A  Recruitment involves authority from the Executive
13  Office to advertise for a vacancy, to receive applications,
14  to interview, to selectee a nominee, to have them go through
15  the background investigation, the drug test and ultimately
16  hopefully be offered a position.
17  JUDGE NIEHOFF: But you don't mean recruitment like
18  a football recruiter where you're going to go out and try to
19  find someone?
20  A  No, recruitment is the official term within the
21  Department of Justice that refers to filling a position
22  vacancy.
23  JUDGE NIEHOFF: Thank you.
24  A  (By Mr. Bridenhagen) I'd like to talk about when
25  Amy -- at the time Amy was learning the standing trustee

### Page 360

1  duties from Mr. Church, was that training a detail in the
2  sense of -- in the policy sense of the word of 120 days or
3  any other time period?
4  JUDGE NIEHOFF: That has been asked and answered.
5  MR. BRIDENHAGEN: Okay. All right.
6  Q  (By Mr. Bridenhagen) Let me talk about the
7  interview then, but let me start first asking you what are
8  your note taking practices?
9  A  I am a prolific note taker, always have been. I'm
10  a trial attorney by trade and have followed the practice of
11  taking detailed notes during telephone conversations, during
12  the U.S. Trustee meetings and at any other time I keep a pad
13  of paper next to my phone with a pen at all times so that
14  should I get a call, I'm able to memorialize. I have
15  found that keeping detailed notes helps me keep track of what
16  has happened, what I need to do and assures that I do not
17  ever miss a deadline nor have I ever missed a deadline.
18  I would also mention that when U.S. Trustees
19  actually miss meetings -- sometimes there's a flight delay --
20  I am asked to share my detailed notes with the Executive
21  Office and they are then forwarded to the U.S. Trustees so
22  that they don't miss anything because I actually type
23  everything up when I get back from the U.S. Trustees meetings
24  and provide those summaries to my assistant.
25  Q  And, actually, before we get to talking about the

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com  Phone: 1.800.280.3376  Fax: 314.644.1334

Page 361

1  Interviews, did you take -- did you follow your standard
2  protocol regarding note taking on September 8th of 2008 when
3  Miss Moore called you?
4    A   Yes, I did.
5    Q   And so are the notes that you took during that
6  interview an accurate recitation of what happened, what was
7  said during the interview?
8    A   Yes.
9    Q   And you subsequently testified that you spoke to
10 AUST Randolph --
11   A   That's correct.
12   Q   -- about the interview? And did you take notes of
13 that interview?
14   A   Yeah.
15   Q   Of that phone conversation?
16   A   Yeah, I wouldn't call it an interview.
17   Q   I'm sorry. I just slipped. That phone
18 conversation --
19   A   Correct.
20   Q   -- with Mr. Randolph?
21   A   Correct. After Miss Moore called to inform me that
22 she and her supervisor were in the process of moving the
23 senior bankruptcy analyst position to the St. Louis office, I
24 first of all reached out to speak with Cindy Beck from our
25 Executive Office and left her a detailed voice mail message

Page 362

1  to call me. And then I followed up with AUST Paul Randolph
2  because I wanted to ask are you the supervisor to whom Miss
3  Moore was referring who was in the process of having the
4  senior bankruptcy analyst position relocated to the St. Louis
5  office. And I did take detailed notes during my conversation
6  with Mr. Randolph at that time.
7    Q   And they are an accurate representation of your
8  conversation with AUST Randolph?
9    A   Yes. He informed me that he had never told Miss
10 Moore that he would help her move the position to the
11 St. Louis office of U.S. Trustee. He did also add that he
12 had spoken with her. In fact, she had approached him before
13 leaving on vacation about her interest in being promoted.
14 She was a GS-14 at the time and he said they would talk about
15 it when she got back from her vacation.
16       I informed Mr. Randolph at the time that there were
17 no GS-15 positions available in the region other than the one
18 that she had applied for, the senior bankruptcy analyst
19 position.
20   Q   I'm having trouble finding those notes for some
21 reason. Do you recall where your notes are?
22   A   I was going to say I looked at them once already.
23       MR. BRIDENHAGEN: I believe it's --
24       MS. MOORE: It's eight, E-8.
25       MR. GARFIELD: I think it's in the back of eight.

Page 363

1  Let me check.
2        MR. BRIDENHAGEN: Is it E-8? That's the
3  interview.
4        MR. GARFIELD: I'm sorry. Take it back.
5        JUDGE NIEHOFF: You don't have to put this on the
6  record.
7        (Whereupon there was a discussion off the record.)
8        JUDGE NIEHOFF: We're back on the record. We found
9  the --
10   Q   (By Mr. Garfield) Please turn to Tab E-11 in the
11 report of investigation.
12       JUDGE NIEHOFF: Page?
13       MR. BRIDENHAGEN: Numbered Page 4.
14   A   Yes.
15   Q   (By Mr. Bridenhagen) Is this -- are these -- is
16 this an accurate copy of the notes that you took that day?
17   A   Yes, it appears to be.
18   Q   And on the following page is that an accurate copy
19 of the notes you took that same day with Paul Randolph and
20 then immediately under there with Dan Casamatta the following
21 day?
22   A   Yes.
23   Q   And with respect to your previous testimony on your
24 communications with Paul Randolph and Dan Casamatta on the
25 VTC and the discussions with Nancy -- with Miss Moore are

Page 364

1  they reflected in that same document at Pages 1 through 3?
2    A   Yes. After speaking with Miss Moore again I left a
3  message for Cindy Beck to call me. I then received an email
4  from AUST Paul Randolph. He indicated to me that Ms. Moore
5  had just informed him that she had called me. And he said
6  the email indicated that he was available to discuss it
7  whenever I was available again. I did call him. And the
8  conversation is memorialized in the document which I believe
9  was on Page 5, Tab E-11 at the top.
10   Q   Okay. I'd like you now to turn to Tab E-8.
11   A   Okay.
12   Q   These are the questions that you previously
13 testified that were asked during the interviews of both Miss
14 Moore and Miss Carpenter. And particularly with respect to
15 questions numbered -- well, at the very top through number
16 four, were they -- no, excuse me. Number 3. Were the
17 questions asked exactly as written?
18   A   I can't say that they were asked exactly as
19 written, but I have a tendency to script my questions ahead
20 of time, so that I get the essence of what I'm trying to
21 elicit from the applicant. So I would say maybe not
22 verbatim, but very close to this. This is how I typically
23 question applicants for any position.
24   Q   Now, rather than asking are you familiar with
25 Chapter 13 duties in Number 2 and familiar with the Chapter

91 (Pages 361 to 364)